IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,

      Plaintiff,

v.

$66,600 IN UNITED STATES
CURRENCY,

      Defendant,

and

KHALID PERVEZ,

      Claimant.

Case No. 3:24-CV-01524-NJR

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

This is a civil action *in rem* in which Plaintiff, the United States of America (the "Government"), seeks the forfeiture of $66,600, which, it claims, constitutes money "furnished or intended to be furnished . . . in exchange for a controlled substance." 21 U.S.C. § 881(a)(6). Claimant Khalid Pervez ("Pervez") has declared an interest in the property and contests the Government's forfeiture efforts.

Now before the Court is Pervez's motion for judgment on the pleadings (Doc. 16). For the following reasons, the motion is denied.

### BACKGROUND

The Court accepts as true the following facts, which are taken from the Government's amended complaint (Doc. 23).

On February 9, 2024, officers from the Drug Enforcement Administration ("DEA") stopped Pervez as he was driving westbound on Interstate 270 in Madison County, Illinois, after observing several traffic violations and a cracked windshield on his vehicle. (Doc. 23-1 ¶¶ 1-2). Before initiating the stop, one of the officers, Lucas Ward, ran Pervez's plates using License Plate Reader (LPR) technology and learned he had traveled eastbound on February 6, 2024 (three days prior), through Joplin, Missouri, St. Clair, Missouri, and Granite City, Illinois.  (Id. ¶ 3).

When Officer Brandon Smiley approached Pervez's vehicle, an RV registered in Oklahoma, Pervez exited from the driver's side door and met him on the passenger side, locking his keys and wallet inside. (Id. ¶¶ 4, 7). DEA officers know, based on their training and experience, that "it is common for individuals involved in criminal activity" to exit a vehicle and approach an officer "in an attempt to distract the officer's focus." (Id. ¶ 4).

After the officers informed Pervez of the reason for the stop, he explained that he had been driving since 6 a.m. and that he was planning to fix his windshield. (Id. ¶¶ 5-6). The officers noticed that Pervez was "looking around constantly," which they attributed to "nervous behavior." (Id. ¶ 5). Pervez explained that he was traveling from his home in Pennsylvania to Tulsa, Oklahoma, to visit his 14-year old son, who resides there. He also stated that he was going to find a job in Tulsa. He added that he did not intend to move to Tulsa but was looking for a trucking job that would allow him to drive between Oklahoma and Pennsylvania. (Id. ¶ 13). Pervez noted that he owned a semi-truck in Oklahoma. (Id.). The officers observed that Pervez "constantly" moved his hands "nervously" while they spoke with him. (Id. ¶ 14).

While Officer Smiley spoke with Pervez, Officer Ward returned to his patrol vehicle to run Pervez's information through law enforcement databases and to issue a warning. (*Id.* ¶ 18). He also requested that another officer bring a drug dog to the scene. (*Id.*). Officer Ward noted that Pervez had been convicted of theft in 2005 and of leaving the scene of a traffic accident with a fatality in 2009 but did not have any outstanding warrants. Pervez also possessed a valid driver's license, issued the day prior. (*Id.* ¶ 19).

Shortly thereafter, Officer Stephen Moravec arrived on the scene with the drug dog, Tobi. (*Id.* ¶ 20). Officer Moravec asked Pervez whether he had anything illegal in the RV; Pervez stated that he did not. (*Id.*). Officer Moravec then asked Pervez whether he was traveling with large amounts of United States currency. (*Id.*). Pervez said he was not. Pervez denied Officer Moravec's request to search the vehicle and stated that he did not sell drugs. (*Id.*).

Officer Smiley confirmed that he only intended to give Pervez a warning for the traffic violations but again requested Pervez's permission to search the vehicle. (*Id.* ¶ 21). Pervez stated that there was nothing illegal inside and asked what the officers were looking for. (*Id.*). The Government alleges that Pervez then "changed his story" and stated that he had some money inside the vehicle but "not that much." (*Id.* ¶ 22). When the officers sought further clarification, Pervez asked how much money it would be illegal to transport. (*Id.*). Officer Smiley responded that there was no set amount that would be illegal and asked once again how much was in the vehicle. (*Id.*). Pervez responded that he did not understand the officers' intentions. (*Id.*). Officer Smiley asked if Pervez had $1 million inside the vehicle; Pervez laughed and denied that he had that

much. (*Id.* ¶ 23).

Officer Moravec handed Pervez a wedge and a metal rod so that he could attempt to get inside the RV. (*Id.* ¶ 25). Pervez was unsuccessful. (*Id.*). Officer Moravec then asked Pervez why he had told him earlier that he did not have a large amount of cash in the vehicle. (*Id.*). Pervez denied that he said that and stated that "he did not have a large amount of currency inside the RV that was being used to buy drugs." (*Id.*). He told Officer Moravec that he had approximately $40-50,000 inside the RV and that he was hoping to buy another semi-trailer with the funds. (*Id.* ¶ 26). Pervez noted that he always carries a large amount of cash because of his religious beliefs, which forbid him from earning interest on funds placed in a bank. (*Id.*). Approximately five minutes later, Pervez was escorted to the officers' patrol vehicle while drug dog Tobi completed a pass around the RV. (*Id.* ¶ 29). Officer Smiley noticed that Pervez, on observing the drug dog, appeared "defeated," "dropping his head and shoulders in a downward motion." (*Id.* ¶ 30). Pervez explained that he carried the money with him so that he could buy a new trailer, items for his truck, the RV, and another vehicle he owns. (*Id.* ¶ 31).

At that point, Officer Moravec told Officer Smiley that the drug dog had detected narcotics in the vehicle. (*Id.* ¶ 32). Officer Smiley read Pervez his Miranda rights, which Pervez stated he understood. (*Id.*). Officer Smiley then asked Pervez where the money in the RV came from. Pervez explained that he had been saving it for a long time and that the funds came from his past work as a truck driver. (*Id.* ¶ 33). He said he was planning to make purchases at an upcoming auction in Oklahoma and hoped to buy commercial property and a new semi-trailer and to give the remaining funds to his son. Pervez stated

Page 4 of 15

his current truck is too old to use, so companies refuse to give him jobs. (*Id.*). Pervez also informed the officers where the money was located inside the vehicle. (*Id.*).

When Officer Moravec told Pervez that the drug dog had alerted to the odor of narcotics, Pervez put his hands down and "dropped his head down in a defeated manner." (*Id.* ¶ 34). Officer Moravec asked Pervez again why he had said there was not a large amount of cash in the vehicle. (*Id.*). Pervez explained that he gets confused. (*Id.*).

Pervez told the officers that the money was not bound in rubber bands and advised the officers he had $60,000, banded in increments of $10,000. (*Id.* ¶ 36). When Officer Smiley asked whether there were receipts for the funds, Pervez stated that they were in Pennsylvania but then stated they were in Tulsa. (*Id.*). He said that he should not have exited his vehicle so quickly. He also said that he does not travel back and forth to Pennsylvania but later stated that he was using the funds in the vehicle to travel back and forth between Oklahoma and Pennsylvania every few months. (*Id.*). Officer Smiley noticed that Pervez was rubbing his hands together while speaking, suggesting nervousness. (*Id.* ¶ 39). Pervez also reported that his lips were dry, which the Government says is another sign of nervousness. (*Id.*). Pervez proceeded to share more details about his life and plans. The Government alleges that several of these statements, particularly those regarding his employment history, travel plans, and smoking habits, contradicted earlier statements he made to the officers. (*Id.* ¶ 41). Pervez also informed the officers that he had paid $3,500 in cash for the RV and that the money inside the vehicle was all in $100 bills. (*Id.* ¶ 43).

Within an hour, a tow company was able to gain access to the interior of the RV.

(*Id.* ¶ 44). The officers entered the RV and located the cash inside wrapped in several plastic bags that had been placed inside of a lunch box. (*Id.* ¶ 45). Officer Ward placed the funds in an evidence bag, and Pervez acknowledged that the money was his. (*Id.* ¶ 46). The RV was transported to the DEA's Fairview Heights office for a more thorough search. (*Id.* ¶ 47). The Government does not allege that any narcotics ever were located in the vehicle.

Pervez participated in a recorded interview with the agents. He told the officers, among other things, that he resides in Tulsa "most of the time," that his Pennsylvania house is in foreclosure and he is in the process of moving to Oklahoma, that he was carrying the cash to use at an auction in Tulsa, that he owns several vehicles but only the RV and truck are registered in his name, that he does not travel between Pennsylvania and Oklahoma anymore because of the cost, and that he stopped looking for a job and was going to "do his own thing." (*Id.* ¶ 48).

During the investigation, agents used another drug dog (Blu) to inspect the cash they recovered from Pervez's vehicle. (*Id.* ¶ 49). They placed the cash in a brown bag and put the bag in a conference room with four similar bags. Blu reviewed two of the bags but did not alert. On sniffing the third bag, Blue came to a sitting position, suggesting that he had smelled narcotics. (*Id.* ¶ 51). That bag contained the cash. (*Id.* ¶ 51). The agents counted the currency and determined that it totaled $66,600.

The DEA initiated an administrative forfeiture proceeding for the cash, and Pervez filed a claim contesting forfeiture. (Gov. Mot. to Strike ¶ 1 (Doc. 11)). On June 18, 2024, the Government filed a Verified Complaint of Forfeiture in this Court. (Doc. 1). Pervez

filed a verified claim of interest in the Defendant property approximately two months later. (Doc. 8). The Government moved to strike Pervez's answer and verified claim as untimely and thus not in "strict compliance" with the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules"), which govern the procedural aspects of this action. On September 30, 2025, the Court denied that motion. (Doc. 15).

On November 25, 2025, Pervez moved for judgment on the pleadings. (Doc. 16). The Government thereafter requested leave to file an amended complaint to add details regarding the second drug dog's detection. The Court granted the Government's request and permitted the parties to file supplemental memoranda on the pending motion for judgment on the pleadings in light of the amended complaint. (Doc. 22).

## LEGAL STANDARD

Under 21 U.S.C. § 881(a)(6), all money furnished or intended to be furnished by a person in exchange for a controlled substance, and all proceeds traceable to such an exchange, are subject to forfeiture to the United States. Civil forfeiture is a proceeding *in rem*, where the property itself is treated as being guilty of the wrongdoing. *United States v. Funds in the Amount of One Hundred Thousand & One Hundred Twenty Dollars ($100,120.00)*, 901 F.3d 758, 768 (7th Cir. 2018). The property owner's culpability is not considered in determining whether the property should be forfeited. *United States v. $128,915.00*, No. 20-00667, 2021 WL 2432064, at *2 (S.D. Ill. June 15, 2021). Thus, even when there is no criminal prosecution, the Government can seize cash that it believes is traceable to drug trafficking. *See* 21 U.S.C. § 881(a)(6); 18 U.S.C. § 983(a)(3). The

Government bears the burden of establishing, by a preponderance of the evidence, that the property is subject to forfeiture. *United States v. Funds in Amount of Thirty Thousand Six Hundred Seventy Dollars ($30,670)*, 403 F.3d 448, 454 (7th Cir. 2005) (citing 18 U.S.C. § 983(c)(1)).

Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions governs the proceedings here. *United States v. Funds in the Amount of $239,400*, 795 F.3d 639, 641 (7th Cir. 2015). Supplemental Rule G(2) provides that a forfeiture complaint must: (a) be verified; (b) state the grounds for subject-matter jurisdiction, *in rem* jurisdiction over the defendant property, and venue; (c) describe the property with reasonable particularity; (d) if the property is tangible, state its location when any seizure occurred; (e) identify the statute under which the forfeiture action is brought; and (f) state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial. Fed. R. Civ. P. Supp. R. G(2)(a)-(f). The Government must carry its burden by a preponderance of the evidence. 18 U.S.C. § 983(c)(1). The preponderance of the evidence standard requires a greater showing than "probable cause." *United States v. 5 S. 351 Tuthill Rd., Naperville, Ill.*, 233 F.3d 1017, 1023 (7th Cir. 2000); *$100,120.00*, 730 F.3d 711, 716 n.5. To meet its burden, the Government must demonstrate a "substantial connection" between the property seized and a criminal offense. *See* 18 U.S.C. § 983(c)(3). It may rely on evidence gathered both before and after the filing of the forfeiture complaint to do so. *Id.* § 983(c)(2). While the claimant may move to dismiss a forfeiture action under Federal Rule of Civil Procedure 12(b), "the complaint may not be dismissed on the ground that the government did not

have adequate evidence at the time the complaint was filed to establish the forfeitability of the property." Fed. R. Civ. P. Supp. R. G(8)(b)(ii); 18 U.S.C. § 983(a)(3)(D); *United States v. 286,161 bottles, et al.*, No. 19-3876, 2020 WL 550598, at *2 (N.D. Ill. Feb. 3, 2020).

A motion for judgment on the pleadings under Rule 12(c) is governed by the same standards as a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Adams v. City of Indianapolis*, 742 F.3d 720, 727-28 (7th Cir. 2014).[1] "When a plaintiff moves for judgment on the pleadings, the motion should not be granted unless it appears beyond doubt that the nonmovant cannot prove facts sufficient to support its position, and that the plaintiff is entitled to relief." *Federated Mut. Ins. Co. v. Coyle Mech. Supply Inc.*, 983 F.3d 307, 313 (7th Cir. 2020) (quoting *Scottsdale Ins. Co. v. Columbia Ins. Grp., Inc.*, 972 F.3d 915, 919 (7th Cir. 2020)). The Court must accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). Generally, a complaint need only state a "plausible claim for relief" and provide fair notice to the defendant. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

When considering such a motion in a civil forfeiture setting, the court need only decide whether the complaint alleges facts sufficient to support a reasonable belief there was a substantial connection between the currency and a criminal offense. *United States v. $42,600.00 United States Currency*, 409 F. Supp. 3d 671, 676 (S.D. Ind. 2019). The court

---

[1] A motion under Rule 12(c) must be brought "[a]fter the pleadings are closed — but early enough not to delay trial." Fed. R. Civ. P. 12(c).

looks to the totality of the evidence in making this determination. *See $30,670*, 403 F.3d at 455; *$100,120.00*, 730 F.3d at 716 n.5.

### DISCUSSION

Pervez argues that the amended complaint fails to allege a plausible nexus between the currency recovered from his RV and a drug trafficking crime. He reasons principally that the dog sniff evidence here is of limited utility because it is possible the dogs reacted to the smell of cannabis, which is legal in Illinois, and given the reality that much of the currency in circulation is contaminated with narcotics. He adds that possessing a large sum of U.S. currency is not indicative of criminal activity. Pervez also argues that the Government violated the Fourth Amendment in the first instance by prolonging the traffic stop to allow a dog-sniff of the vehicle.

In response, the Government asserts that it has satisfied its pleading standard by pointing to multiple factors connecting the cash to a drug transaction, including Pervez's decision to exit the RV abruptly and lock his keys in the vehicle, certain statements he made to officers that the Government alleges were contradictory and evasive, the nature of his travel plans, and the positive alerts by the drug dogs. The Government further contends that the present motion is an inappropriate vehicle to address Pervez's Fourth Amendment arguments. It adds that even if the Court were to consider the issue, the length of the stop was at least partially attributable to Pervez being locked out of the vehicle while on the side of the highway, and his behavior gave them a reasonable basis to continue their investigation in any event.

The Court finds that the amended complaint sufficiently alleges facts to support a

reasonable belief that the Government will be able to meet its burden of proof at trial of demonstrating the $66,600 was furnished by a person in exchange for a controlled substance or is proceeds traceable to such an exchange, as required by 21 U.S.C. § 881(a)(6). Accepting the alleged facts as true, Pervez was pulled over on Interstate 270 on the way to Oklahoma after conducting a short trip to Pennsylvania. The Government alleges that the short trips are a possible indicator of criminal activity. (Doc. 23-1 ¶ 23). When the officers approached his vehicle, Pervez exited quickly, approaching the officers, locking himself out of the car in the process. The Government notes that individuals involved in criminal behavior often approach officers in an attempt to distract their focus. (*Id.* ¶ 4). The officers also observed Pervez acting nervously during their interaction with him — looking around and gripping his hands tightly. Pervez's dry lips were another indicator of his nervousness. (*Id.* ¶ 39). Perhaps most relevant to the issues here, *two* dogs alerted to the presence of drugs. The first dog alerted at the scene during a walk-around of the RV. The second alerted to the currency itself at the DEA office. The Court finds that the facts alleged in the amended complaint support a reasonable inference that the currency has a substantial connection to a criminal offense — drug trafficking. Although a factfinder ultimately may discount some or all of these facts and conclude that the Government has not met its burden of demonstrating by a preponderance of the evidence that the cash is connected to a drug crime, its allegations are sufficient to satisfy the initial pleading burden.

This Court considered similar circumstances in *United States v. $24,000.00 in United States Currency*, No. 21-1073, 2022 WL 1692444 (S.D. Ill. May 26, 2022). There, the

Government's complaint described cash seized from a claimant who had been driving an illogical route to his stated destination, possessed a firearm, and was exhibiting visible signs of nervousness. 2022 WL 1692444 at *3. The officers also noted a strong odor of air freshener emanating from the vehicle and ultimately located a large sum of money in the car's center console. A dog sniff alerted to an odor of narcotics on the money. *Id.* The Court held that those circumstances were sufficient to state a claim. *Id.* To be sure, some of the facts at issue there are distinguishable from this case, but material aspects are similar. In both cases, officers discovered large quantities of concealed cash from vehicles where the driver had unusual travel plans and exhibited nervous behavior. Most important, in both cases, drug dogs alerted to the currency.

Pervez argues that the Seventh Circuit has warned courts to be wary of the persuasiveness of dog sniff evidence in light of a concern that much of the currency in circulation contains sufficient quantities of narcotics to prompt an alert. *See United States v. $506,231 in U.S. Currency*, 125 F.3d 442, 453 (7th Cir. 1997) (stating that the "probative value of dog sniffs is, at most, minimal."). More recently, however, the Seventh Circuit has taken the view that "that a properly trained dog's alert to currency should be entitled to probative weight." *$30,670*, 403 F.3d at 459. In that case, the court of appeals concluded that a positive dog sniff was "strong probative evidence of illegal narcotics activity." *Id.* at 470. The court reached that conclusion after consulting scientific research indicating "that circulated currency, innocently contaminated with [microgram] quantities of cocaine would not cause a properly trained detection canine to signal an alert even if very large numbers of bills are present." *Id.* at 459. The panel explained that prior Seventh

Circuit cases, including *$506,231*, cited by Pervez, relied on an "uncritical adoption of the currency contamination theory." 403 F.3d at 459. Thus, the Court believes that the dog sniff evidence here goes a long way toward satisfying the Government's initial pleading burden. That is not to say that it will be conclusive. There may be questions about the reliability of dog sniff evidence in a given case, *e.g.*, *$100,120.00*, 730 F.3d at 721, but the Court does not see how those issues could be resolved on a motion for judgment on the pleadings, absent factual development.

Pervez also cites *$506,231* for the proposition that large amounts of currency and its manner of storage are not sufficient to create probable cause for the connection between that currency and drug trafficking. To start, this argument presupposes a "divide-and-conquer approach" to the factors cited by the Government that the Seventh Circuit has disclaimed. *See $30,670*, 403 F.3d at 469. In any event, the case he cites does not support so broad of a rule. The Seventh Circuit merely held that "[t]he existence of any sum of money, *standing alone*, is not enough to establish probable cause to believe the money is forfeitable." 125 F.3d at 452 (emphasis added). Here, the amended complaint cites other factors that support the reasonable belief that the Government will be able to meet its burden, including the dog sniff evidence discussed above.

Relatedly, Pervez appears to take the position that the Government's complaint is facially deficient because it fails to allege the existence of probable cause for the seizure. (Doc. 24, p. 9). That showing certainly was required before the enactment of the Civil Asset Forfeiture Reform Act of 2000 (CAFRA), *see $100,120.00*, 730 F.3d at 716 n.5. The Seventh Circuit has not yet addressed whether that pleading requirement survived

CAFRA. *See United States v. $42,600.00 United States Currency*, 409 F. Supp. 3d 671, 675 (S.D. Ind. 2019). However, district courts in this circuit have held that "CAFRA repealed by implication [the prior statute's] probable cause requirement for civil-forfeiture complaints," meaning the complaint only "must allege facts that support a reasonable belief that there was a substantial connection between the Currency and a criminal offense." *Id.* at 676 (citing *United States v. Lopez-Burgos*, 435 F.3d 1, 2 (1st Cir. 2006); *United States v. $557,933.89, More or Less, in United States Funds*, 287 F.3d 66, 77 (2d Cir. 2002)); *United States v. $299,745.00 in United States Currency*, No. 23-01584, 2024 WL 1908114, at *7 (S.D. Ind. May 1, 2024).[2] For the reasons explained above, the Court believes the amended complaint satisfies that standard.

Pervez also challenges the seizure under the Fourth Amendment, primarily on the ground that the officers unlawfully extended the stop without reasonable suspicion of criminal activity. *See Rodriguez v. United* States, 575 U.S. 348, 354-55 (2015). The Court agrees with the Government that a motion for judgment on the pleadings is not the proper procedural vehicle to address this issue. Notably, Pervez seems to challenge the *facts* as alleged by the Government. For instance, he refers to body worn camera and dashcam footage that is not before the Court (Doc. 24 ¶¶ 44, 48, 53) and characterizes locking his keys in the RV as "accidental." (*Id.* ¶ 18). He also discusses the training records of one of the drug dogs, which also are not in the Court's possession. (*Id.* ¶ 62). The

---

[2] The Ninth Circuit has taken a different approach, holding that the probable cause requirement survived CAFRA. *See United States v. $493,850.00 in U.S. Currency*, 518 F.3d 1159, 1169 (9th Cir. 2008). Pervez does not explicitly cite the Ninth Circuit's position, much less explain why the Court should adopt it here. Under the circumstances, the Court will follow the approach of the other district courts in this circuit.

Court's review of a motion for judgment on the pleadings is generally limited to the facts alleged in the complaint. A motion to suppress would permit the parties to present evidence to the Court.

Even if the Court were to look only to the facts described in the amended complaint in assessing whether the officers violated the Fourth Amendment, Pervez has not adequately responded to the Government's suggestion that the length of the stop was a natural consequence of being locked out of the vehicle on the side of the highway. This is not to say the Court agrees with the argument but merely to observe that the briefing on the issue is insufficient to justify a decision at this time.

## CONCLUSION

For these reasons, Pervez's Motion for Judgment on the Pleadings (Doc. 16) is **DENIED**. The Court will set a scheduling conference by separate order. Pervez **SHALL** answer the amended complaint **on or before May 4, 2026**.

**IT IS SO ORDERED.**

DATED:  **April 20, 2026**

**NANCY J. ROSENSTENGEL**
**United States District Judge**